IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FRANK SODA, | * | |
|     Plaintiff | * | |
| v. | * | CIVIL NO. JKB-15-898 |
| U.S. OFFICE OF PERSONNEL MANAGEMENT, *et al.*, | * | |
| | * | |
|     Defendants | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Frank Soda brought this suit against the U.S. Office of Personnel Management ("OPM"), the Director of OPM, the U.S. Department of Health and Human Services ("HHS"), the Secretary of HHS, the U.S. Department of Labor ("DOL"), the Secretary of DOL, the U.S. Department of the Treasury ("Treasury"), and the Secretary of the Treasury, challenging their "implement[ation of] the Federal Employee Health Benefits[] Plan under the Affordable Care Act." (Am. Compl. ¶ 1, ECF No. 8.) Plaintiff claims that by instructing insurance carriers to offer federal employees health insurance plans that provide contraceptive coverage without cost-sharing, Defendants have violated his rights as a religious objector to abortion and contraception. Defendants have moved to dismiss for lack of standing (ECF No. 22), and the motion is fully briefed. No hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, Defendants' motion will be granted, and the case will be dismissed.

## I.     *The Federal Employee Health Benefits Program*

Plaintiff's challenge implicates the complicated regulatory framework governing the Federal Employee Health Benefits ("FEHB") Program. As such, the Court begins with a brief overview of the FEHB Program's history, purpose, and structure.

In 1959, Congress enacted the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901–8914, in order to establish "a comprehensive program of subsidized health care benefits for federal employees and retirees." *Muratore v. U.S. Off. of Pers. Mgmt.*, 222 F.3d 918, 920 (11th Cir. 2000). The FEHBA tasks OPM with administering the FEHB Program. *See id.* Pursuant to this authority, OPM contracts with private insurance carriers to offer health insurance plans to federal employees and retirees. *See* 5 U.S.C. §§ 8902–8903a. The FEHBA provides OPM with discretion to determine what benefits are "necessary or desirable" and to "prescribe reasonable minimum standards" that FEHB plans must meet. 5 U.S.C. § 8902. OPM renegotiates coverage and rates annually, using "call letters" to establish terms and solicit offers from insurance carriers. *See* 5 U.S.C. § 8902(i); 5 C.F.R. § 890.203.

Federal employees are not required to utilize insurance provided through the FEHB Program. If an employee chooses to do so, the employee has the option of selecting among a number of approved plans offered by qualified private carriers. The federal employer of a participating employee is required to pay into an OPM-administered "Employees Health Benefits Fund" (the "EHB Fund") an amount equivalent to the lesser of (1) 75% of the premium for the plan the employee selects or (2) 72% of the weighted average of all premiums in the program, using "the appropriation or fund which is used to pay the employee." 5 U.S.C. §§ 8906(b), 8906(f), 8909(a). The rest of the "amount necessary to pay the total charge for enrollment" is "withheld from the pay of [the] enrolled employee" and paid into the EHB Fund. 5 U.S.C. §§ 8906(d),

8909(a). OPM then uses the EHB Fund to pay enrollment costs to the employee's selected insurance carrier, and the carrier pays the employee's covered medical expenses. 5 U.S.C. § 8909.

In 1999, Congress mandated that OPM could not permit private carriers to offer FEHB plans that include prescription drug coverage but do not include contraceptive coverage. *See* Omnibus Consolidated & Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, 112 Stat. 2681 (1998). However, the restriction included an exception for carriers objecting to contraceptive coverage on grounds including "religious beliefs." *Id.* No insurance carrier for federal employees in the Maryland area ever sought to avail itself of this exception. (*See* Mot. Dismiss. Mem. Supp. at 9, ECF No 22-1.) Indeed, Defendants assert—and Plaintiff does not contest—that as far back as 1997, every FEHB plan for the Maryland area has included contraceptive coverage. (*See id.* at 24 n.14 (summarizing evidence).)

The passage of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (the "ACA"), affected the administration of the FEHB program by establishing certain minimum standards applicable to employee group health plans. The ACA delegated authority to the Health Resources and Services Administration ("HRSA") to designate preventive health services that employee group health plans would be required to cover without cost-sharing,[1] *see* 42 U.S.C. § 300gg-13, and the HRSA so designated, "all Food and Drug Administration[] approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity, as prescribed by a provider." 77 Fed. Reg. 8,725, 8,725 (2012) (internal quotation marks omitted). In accordance with this new

---

[1] The ACA defines cost-sharing as "deductibles, coinsurance, copayments" and other expenditures paid by an insured individual with respect to essential health benefits covered under a group health plan. 42 U.S.C. § 18022(c)(3)(A).

3

requirement, OPM's March 29, 2012 Call Letter eliciting proposed insurance plans for the 2013 plan year instructed carriers that FEHB plans would be required to "cover contraceptive services with no cost-sharing." (*See* OPM Call Letter 2012-09, Mot. Dismiss Ex. C, ECF No. 22-4.) As had been the case for over a decade, no carrier for the Maryland area sought to take advantage of the exception to the contraceptive coverage requirement. (*See* Mot. Dismiss. Mem. Supp. at 9.) Accordingly, since 2012, all FEHB plans for the Maryland area have offered contraceptive coverage without cost-sharing.

## II. *Factual and Procedural Background*

Plaintiff Frank Soda is an employee of the Defense Contract Management Agency, a component of the U.S. Department of Defense. (Am. Compl. ¶ 31.) He has been employed by the federal government since 1977 and has received healthcare coverage through the FEHB program throughout that time. (Resps. to First Set of Disc. Reqs. at 21–22, Mot. Dismiss Ex. D, ECF No. 22-5 ["Interrog. Resps."].) Soda self-identifies as a devout Roman Catholic, and he adheres to religious strictures that "forbid him from participating in, providing access to, paying for, training others to engage in, or otherwise supporting abortion," or any method of contraception besides the "rhythm method." (Am. Compl. ¶¶ 6–7; Deposition of Frank Soda at 31:2–34:4, 64:1–67:3, Mot. Dismiss Ex. A, ECF No. 22-2 ["Soda Depo."].) He is also a senior citizen, and is thus enrolled in Medicare Part A. (Interrog. Resps. at 23–24.) Plaintiff does not have any family members who utilize his insurance. (Soda Depo. at 14:22–15:3.)

Since at least 1997, every FEHB plan in which Plaintiff has enrolled has covered contraceptive care. (*See* Mot. Dismiss. Mem. Supp. at 24 n.14 (summarizing evidence).) Prior to the enactment of the ACA, Plaintiff did not consider his enrollment in such plans problematic. (*See* Soda Depo. at 50:1–52:2, 72:9–72:18.) However, the discourse surrounding the ACA led

4

Plaintiff to question the compatibility of healthcare offering contraceptive coverage and Catholic doctrine. (*Id.*) Plaintiff developed the view that, while his faith permitted him to continue to enroll in FEHB plans and did not require him to explore other available insurance options, it did require him to fight against the requirement that FEHB plans cover contraceptive care. (*Id.* at 52:5–55:15.) In accordance with this new position, Plaintiff requested that OPM specifically notify insurers in its call letters regarding the religious belief exemption to the contraceptive mandate. (Am. Compl. ¶ 17.) In a 2014 response letter, OPM acknowledged this exemption, but OPM declined to amend the text of its call letters. (*Id.* ¶ 18.)

Plaintiff brought this lawsuit on March 29, 2015, with the stated purpose of remedying "the violation of his civil rights which (1) the no cost-sharing coverage requirement effectively imposes on him incrementally, and (2) the Affordable Care Act's contraceptive services requirement scheme, in general, imposes on him." (Am. Compl. ¶ 5.) Plaintiff brought ten Counts, for violation of the Religious Freedom Restoration Act, the Administrative Procedure Act, 41 U.S.C. § 1707, and the First and Fifth Amendments to the U.S. Constitution. (*See id.*) Plaintiff seeks declaratory judgment and "a permanent injunction prohibiting imposition on Plaintiff and other individuals and organizations that object on religious grounds of any requirement that any covered health insurance policy cover contraceptive services." (Am. Compl. at 33.) Following Defendants' Answer (ECF No. 17), the Court set in a scheduling order providing for a brief period of discovery regarding jurisdictional facts, to be followed by Defendants' anticipated motion to dismiss for lack of standing (ECF No. 19).

On February 26, 2016, Defendants filed their motion to dismiss. (ECF No. 22.) Defendants argued: (1) Plaintiff has failed to state a cognizable injury; (2) the alleged injury Plaintiff describes was not "caused" by the conduct he challenges; and (3) the alleged injury is not

5

redressable through this litigation. (*See* Mot. Dismiss. Mem. Supp.) Plaintiff filed a two-page opposition succinctly explaining that "Plaintiff relies primarily on the U.S. Supreme Court's decision and reasoning in Hobby Lobby, 134 S. Ct. 2751 (2014) to establish constitutional standing[.]" (Opp'n Mot. at 2, ECF No. 38.) The parties then submitted a series of consent motions to extend the deadline for Defendants' reply, to provide time for pending administrative action with the potential to moot the dispute. (*See, e.g.*, ECF No. 45.) The Court eventually stayed the matter to allow for the resolution of the administrative action and related litigation. (*See* ECF Nos. 50, 68, 73.) The Court lifted the stay in October 2020 (*see* ECF No. 82), and Defendants then filed their reply (ECF No. 89).

### *III.   Legal Standard*

A plaintiff's standing to sue in federal court is "an integral component of the case or controversy requirement" of Article III. *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). As such, a challenge to a plaintiff's standing "implicates th[e] court's subject matter jurisdiction," and may be raised on a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 230 (4th Cir. 2008).

> For a plaintiff to have Article III standing, three distinct elements must be met:
>
> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, alterations, and citations omitted). "[T]he burden of establishing standing 'lies squarely on the party claiming subject-matter jurisdiction.'" *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 226 (4th Cir.

2009) (quoting *Frank Krasner Enters. Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)). When faced with a Rule 12(b)(1) motion challenging standing, "the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Stahlman v. United States*, 995 F. Supp. 2d 446, 451 (D. Md. 2014) (citations omitted); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

## IV. *Analysis*

The case will be dismissed for lack of standing. Plaintiff has not identified a cognizable injury. Further, the alleged injury he identifies was not caused by the actions he challenges, and the injunction he seeks is not likely to provide redress.

### A. *Injury*

The only injury Plaintiff identifies is an alleged injury to his religious practice associated with his decision to participate in FEHB healthcare plans that cover contraceptive care. Plaintiff does not claim that by requiring FEHB plans to offer contraceptive care without cost-sharing, Defendants caused Plaintiff's health insurance costs to increase. Indeed, at deposition, Plaintiff specifically disclaimed the notion that this lawsuit has anything to do with his premium costs (*see* Soda Depo. at 47:20–48:4), and the only evidence submitted on the issue reflects that the cost-sharing requirement had no effect on Plaintiff's premiums. (*See* Mot. Dismiss Mem. Supp. at 20 (citing regulatory findings that contraceptive coverage requirements are cost-neutral).) Further, as a senior citizen covered by Medicare Part A, Plaintiff has never been subject to the ACA's individual mandate and the corresponding coercive penalty (which is now $0). *See* 26 U.S.C. § 5000A. Instead of a financial injury, the harm Plaintiff identifies is an alleged injury to his

religious practice, stemming from his concern that his voluntary participation in FEHB plans that cover contraception without cost-sharing causes him "to pay for contraceptive services" provided to others, in violation of his religion. (Am. Compl. ¶ 8.) Foundational to this theory of harm is the assumption that, in some concrete sense, Plaintiff's healthcare premiums directly fund other plan participants' contraceptive care.

The evidence before the Court does not support Plaintiff's characterization of his participation as involving concretely "funding abortions" and contraception. (Am. Compl. ¶ 4.) Instead, the evidence reflects Plaintiff's engagement in a complicated system wherein his contributions—which amount to only a fraction of his own health insurance costs—are routed into a pooled EHB Fund from which OPM pays various insurers, who themselves cover myriad medical expenses using funds from various sources. Though Plaintiff may fear that a portion of his contributions could, hypothetically, be used to pay for someone's contraceptive care, this fear is conjectural; unlike an employer who directly subsidizes employees' care, or a parent who sponsors a dependent child's coverage, Plaintiff has no reason to think that he has an actual role in funding any particular provision of care to any other plan participant. *C.f. Real Alts., Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 359–60 (3d Cir. 2017) (distinguishing employers from plan participants and explaining that "any link between [a plan participant's] decision to sign up for insurance on the one hand and the provision of contraceptives to a particular individual on the other is" highly attenuated). Indeed, Plaintiff's situation is hardly distinguishable from that of any religious taxpayer who can imagine her tax contributions being routed to the EHB Fund, and from there to an insurer that covers care to which she objects. *C.f. Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 600 (2007) (quoting *Doremus v. Bd. of Ed. of Hawthorne*, 342 U.S. 429, 433 (1952)) (explaining such taxpayers lack standing because the connection between their

8

contributions and any particular expenditure is "too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court[.]"). In sum, Plaintiff fails to establish an Article III injury because he has not shown a "concrete" or "actual" connection between his premium payments and the provision of contraceptive care.

### B. Causation

Even assuming that Plaintiff has stated a cognizable harm, and being enrolled in a healthcare plan that covers contraceptive care does cause Plaintiff a religious injury, Plaintiff would still fail the standing inquiry because he cannot establish "a causal connection between the injury and the conduct complained of"—namely, OPM's implementation of the ACA's cost-sharing requirement in 2012. *See Defs. of Wildlife*, 504 U.S. at 560.

The record reflects that all FEHB plans for Plaintiff's area covered contraceptive care for over a decade prior to OPM's implementation of the ACA. Thus, it cannot be said that the challenged actions caused Plaintiff's predicament and associated alleged injury. To be sure, OPM's implementation of the ACA did eliminate the possibility that FEHB plans offering contraceptive coverage would employ cost-sharing. But the record is clear that even absent cost-sharing, Plaintiff would face precisely the same religious dilemma between contributing premiums to a plan that subsidizes contraceptive care and declining FEHB coverage. (*See* Soda Depo. at 50:1–51:7.) With or without cost-sharing, participation in an FEHB plan would entail contributing premiums, some unknown portion of which could hypothetically be used to cover the cost of contraceptive care, to which Plaintiff objects. As such, Plaintiff cannot show a causal nexus between the challenged actions and his alleged religious injury, whose existence is independent of Defendants' implementation of the ACA. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412–13 (2013) (holding there was no standing where the alleged injury could occur regardless of the

government actions challenged by plaintiffs, and therefore was not fairly traceable to those actions); *Marshall v. Meadows*, 105 F.3d 904, 906–07 (4th Cir. 1997) (finding no standing where a superseding cause was responsible for plaintiffs' injury).

### C. Redressability

Finally, Plaintiff has failed to demonstrate that it is "likely, as opposed to merely speculative, that [his alleged] injury will be redressed by a favorable decision." *Defs. of Wildlife*, 504 U.S. at 560 (internal quotation marks and citations omitted). When the possibility that an injury will be remedied by an injunction "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* at 562 (internal quotation marks and citations omitted). Here, even if the Court were to grant Plaintiff's requested injunction against Defendants, thereby "prohibiting imposition on Plaintiff . . . of any requirement that any covered health insurance policy cover contraceptive services" (Am. Compl. at 33), Plaintiff's alleged injury would be cured only if a non-party private insurance carrier decided to offer an FEHB plan that met his religious restrictions. Thus, Plaintiff bears the burden of adducing facts demonstrating a likelihood that a private carrier would do so.

Plaintiff has failed to carry this burden. Plaintiffs in similar cases have established redressability by providing direct evidence of insurers' willingness to offer plans that do not cover contraception or circumstantial evidence of historical practice indicative of such willingness. *See, e.g., March for Life v. Burwell*, 128 F. Supp. 3d 116, 123 n.6 (D.D.C. 2015) (finding redressability where plaintiffs submitted a letter from an insurer showing it was prepared to offer a plan that did

10

not cover contraception). Here, Plaintiff has presented no such evidence. As noted, the historical practice evidence reflects that every FEHB insurance carrier for the Maryland area exclusively offered plans covering contraceptive care for over a decade before the challenged actions. Further, though Plaintiff initially represented that he had "received correspondence from providers indicating they'd welcome an opportunity to provide plans that comply with Plaintiff's religious objections" (Opp'n Mot. at 2), his subsequent submissions clarified that no insurance carrier has provided any indication that it would be prepared to offer such a plan (*see* Supp. Opp'n at 2–3, ECF No. 60; Soda Decl. ¶¶ 2–8, ECF No. 60-3). Thus, Plaintiff has presented no evidence in support of his assertion that, if given the option, an FEHB insurance carrier would offer a plan that meets his religious requirements. Absent such evidence, there is no basis for finding it likely that Plaintiff's alleged injury could be redressed by a favorable decision. *C.f. Frank Krasner*, 401 F.3d at 236 (holding Plaintiff failed to establish redressability where the alleged injury was the result of the actions of a regulated third party, not the government defendant).

The Court does not doubt the sincerity of Plaintiff's belief that he "has an obligation to fight Obamacare's (the []Affordable Care Act's) abortion and contraceptives mandate." (Opp'n Mot. at 2.) "[B]ut standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982). Plaintiff has not established the necessary elements of injury, causation, and redressability, and the Court therefore lacks jurisdiction over this matter.

### V.    *Conclusion*

For the foregoing reasons, an order shall enter granting Defendants' motion to dismiss.

11

DATED this 12 day of February, 2021.

BY THE COURT:

_____
James K. Bredar
Chief Judge